**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:24-cr-00018-RFB-MDC |
| Plaintiff, | **ORDER** |
| v. | |
| TANNER LUCAS CASTRO, | |
| Defendant. | |

Pending before the Court is Defendant Tanner Castro's Motion to Dismiss. ECF No. 33. For the following reasons, the Court denies the motion.

**I.      PROCEDURAL HISTORY**

On January 30, 2024, an indictment was filed as to Tanner Lucas Castro for Coercion and Enticement in violation of 18 U.S.C, Section 2422(b).[1] ECF No. 1. A grand jury was held the same day. ECF No. 2. An arrest warrant was issued. ECF No. 3. On February 2, Defendant appeared for his initial appearance/arraignment. ECF No. 5. He pled not guilty. A PR Bond was entered. ECF No. 8. On February 12, the US filed a joint discovery agreement. ECF No. 10. Defendant filed six separate stipulations to continue, which were granted. ECF Nos. 12, 13, 15, 16, 19, 20, 25, 28, 29, 30, 31, 32.

On December 16, 2024, Defendant filed the instant Motion to Dismiss Due to Failure to Preserve Evidence, or Due to Outrageous or Fundamentally Unfair Government Conduct. ECF

---

[1] "Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life." 18U.S.C.§2422(b).

No. 33. It was briefed by January 20. ECF Nos. 34, 36. On February 5, the Court set a hearing for February 20. ECF No. 37. Defendant filed a Stipulation to Continue, which was granted. ECF Nos. 38, 39. On February 24, the Court set deadlines to file witness and exhibit lists for the hearing. ECF No. 40. On March 21, the Court advanced the hearing to June 17. ECF No. 41.

On March 30, Defendant filed a Motion to Compel. ECF No. 42. It was briefed by April 17. ECF Nos. 43, 45. On May 22, Defendant filed his exhibit list and witness list. ECF No. 47, 48. On June 5, the Court issued a Minute Order denying the Motion to Compel. ECF No. 49. On June 9, the government filed their witness list and exhibit list. ECF Nos. 50, 51. On June 12, Defendant filed an amended exhibit list. ECF No. 52.

On June 17, the Court held a hearing and heard from Detective Christopher Johnson with the Reno Police Department. ECF No. 53. On June 17, the Court entered the exhibit and witness list for the hearing. ECF No. 54. On July 3, the parties filed a Joint Status Report. ECF No. 56.

The Court's Order follows.

## II.     FACTUAL FINDINGS

The Court makes the following findings of fact. On October 10, 2023, Task Force Officer (TFO) Chris Johnson of the Reno Police Department (RPD) and the Northern Nevada Child Exploitation and Human Trafficking Task Force, utilized a decoy profile of a fictious 15-year-old female named Ashleigh on the social media application KIK. KIK is an application that allows its users to join chat groups, private message other users, and send/receive photos and videos. The decoy profile "Ashleigh" utilized the likeness of Confidential Human Source 1 (CHS-1), who is an adult.

"Ashleigh" joined the KIK group "Vegas Teens" on October 10, 2023. The group contained approximately 80 members at the time. That same day, a message was sent by the decoy profile to the group chat stating "Hiii. This group alive?? Lol".

Subsequently, "Ashleigh" was contacted by KIK user "Brian D," a member of the "Vegas Teen" group chat. The user's profile picture was what appeared to be an adult man's unclothed upper torso from his waist to his neck. He privately messaged "Ashleigh" directly stating "Hey what's up?" After his initial message went unanswered for approximately 30 minutes, "Brian" sent

another unsolicited private message. This time stating "26m here vegas local" indicating that he was a 26-year-old male living in Las Vegas, Nevada. The following afternoon, on October 11, 2023, "Ashleigh" responded "Hiii. 15 f Vegas," indicating that she was a 15- year-old female in Las Vegas, Nevada.

"Brian" asked her several questions related to why she was on KIK; if she lived in Las Vegas; if she was going to start driving soon; where she went to high school; and if she used any other social media applications. Upon learning that "Ashleigh" used Snapchat, "Brian" asked for her "snap," indicating he wanted her Snapchat username. The Snapchat username "Saaviashii" was provided to "Brian" on October 13, 2023. The conversation on KIK took place from October 10, 2023, through October 13, 2023, when it moved over to Snapchat.

TFO Johnson also utilized a previously established decoy profile for "Ashleigh" on Snapchat. The Snapchat decoy profile for "Ashleigh" had the username "saaviashli" with a display name "Ashlii." The Snapchat decoy profile also used the likeness of CHS-1.

On October 13, 2023, moments after "Ashleigh" sent "Brian" (and only him) her snap username (saaviashli) on KIK, "Ashlii" on Snapchat received a message from "Rogue 9696." "Brian D" from KIK and "Rogue 9696" of Snapchat were both later identified to be the defendant, Tanner Lucas Castro.

After receiving a reply from "Ashlii" on Snapchat, the defendant wrote "so what do you look like? (with a thinking emoji)." After exchanging snaps of their respective selfies, the defendant then messaged "Are you real? (thinking emoji) Send a pic of you doing (emoji of shaka sign)." "Ashlii" complied and provided a snap of a selfie doing the shaka sign. Upon request of the same, the Defendant also sent a snap of a selfie of him doing the shaka sign.

"Ashlii" then messaged the Defendant that her name is Ashleigh, and the Defendant replied that his name was Brian. The conversation on Snapchat continued and the Defendant requested several more photos, asked questions related to school, homecoming, use of other social media applications, meeting people in person that "Ashlii" connected with online, and dating.

The Defendant then inquired if "Ashlii" was "doing anything fun" that night. The conversation turned to discussing what they would do if they met up in person and an exchange

where the Defendant again asked for photos of "Ashlii," sent selfie snaps of himself, and discussed having met up in-person with individuals that he encountered on the internet. The Defendant informed "Ashlii" that he met up with someone from KIK in person "to get ice cream" and in the next message sent the winking emoji.

Upon learning that "Ashlii" previously been physically involved with a 24-year-old she met on KIK, the Defendant messaged about getting ice cream. He then replied to an image of "Ashlii," depicting her laying down on a rock at the beach in a bathing suit or tank top, displaying her face, neck, right shoulder and chest, stating "any others of you?" "Ashlii" refused to send any more photos and the conversation shifted to the Defendant attempting to video chat with her through Snapchat. "Ashlii" continued to refuse and the Defendant stated that he "can be more honest" over a call and "can't be so open over text" because "even if [the chats are] delete[d] snapchat can get it back." He also continued with the sexual innuendo regarding ice cream and messages: "I think you know what flavor of ice cream I wanted lmao (laugh crying emoji)."

Subsequently, there were three audio calls and one video call made through Snapchat. For all, the decoy Snapchat profile for "Ashlii" was used. However, the female portraying "Ashleigh" during these calls was Confidential Human Source 2 (CHS-2), also an adult. CHS-2 was utilized for the calls because CHS-1 was not near TFO Johnson at the time, and the two CHSs look similar in appearance.

The audio of each of these calls were recorded:

First Call (1 minute and 38 seconds): "Ashlii" inquired what the Defendant wanted to do, and the Defendant asked her to turn on her video. "Ashlii" refused saying "no, not until I know exactly what we're doing" and "you literally said that you wanted to tell me over the phone on what we're doing, but you keep playing games, so just stop playing games." The Defendant stated that he wanted to meet up but wouldn't provide details because he "work[s] with computers" and was "just a little nervous." "Ashlii" ultimately hung up the phone. The Defendant then messaged "sorry I'm nervous (nervous emoji)" and tried to call again. The call went unanswered but "Ashlii" placed another call to the Defendant.

Second Call (2 minutes and 36 seconds): For most of the call "Ashlii" stated that she was

done sending photos. The Defendant persisted with his request to video chat, stating "just do this, just do this one thing. Please." The Defendant continued to ask to video chat before "Ashlii" ultimately hung up the phone.

Video Call (5 seconds): The audio begins with TFO Johnson and CHS-2 speaking with each other before transitioning to the audio portion of the video call placed to the Defendant through Snapchat. TFO Johnson instructs CHS-2 to "just make it quick," she asks: "Should I just video, or just call?" He replies: "Video." There is a brief pause, during which the video call with Defendant starts. CHS-2 states "there you got everything you wanted," and the Defendant can be heard laughing. CHS-2 then states "nope!" while laughing and hangs up the call.

The conversation on Snapchat continued as follows:

Defendant: "alright (sighing emoji) look I really want to come over just video call and I'll tell you. Otherwise maybe next time? I know I'm being extra. I'm sorry. Why are you outside lmao?" Decoy: "Because I wanted to walk outside a little. Am I not allowed to go outside? (laugh crying emoji)[.]" Defendant: "No you are where are you at I'll pick you up lmao (laugh crying emoji)."

The Defendant tried to call her again, but the call was refused. He then wrote "if you would have stayed on I would have told you (laugh crying emoji)." "Ashlii" placed a final audio call through Snapchat.

Phone Call (one minute and 26 seconds): During this call the Defendant was on video, but CHS-2 was audio only for the call. Decoy: "Hey, What did you wanna do?" Defendant: "Do you wanna hook up?" Decoy: "I mean, yeah, I thought that that's what you wanted to do. I thought that's what the plan was. Did you get condoms?" Defendant: "Yeah." They coordinated picking up "Ashlii" at a park near her house. The call ended. "Ashlii" messaged the defendant the name of the park, and he replied "k 25 mins."

The Defendant asked for, and was provided, two photos of "Ashlii" getting ready. Defendant wrote: "show me what I have to look forward to (winking face emoji)" and asked for photos of "Anything you think will get me excited hahaha"

When Mr. Castro arrived at the prearranged site at 9:45 pm on October 13, he was arrested.

Officers seized a blue Apple iPone and a box of condoms.

### III.    LEGAL STANDARD

### A. Motion to Dismiss the Indictment due to the Failure to Preserve Exculpatory Evidence

The Due Process Clause of the Fifth Amendment provides a criminal defendant with "a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1985). The Supreme Court developed "what might be loosely called the area of constitutionally guaranteed access to evidence." Id. The Supreme Court has refused, however, to read the fundamental fairness requirement of the Due Process Clause "as imposing on the police an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988).

In Trombetta, 467 U.S. at 489, the Supreme Court held that the government's duty to preserve evidence must be limited to "material" exculpatory evidence. Evidence is materially exculpatory only if it: (1) "possess an exculpatory value that was apparent before the evidence was destroyed," and (2) is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Trombetta, 467 U.S. at 488–89; see also United States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993). If the evidence is not "materially exculpatory," the court could still find the evidence "potentially useful" under Youngblood. Arizona v. Youngblood, 488 U.S. 51, 57–58 (1988). The examination of "potentially useful" evidence differs from Trombetta in that it requires a showing of bad faith to constitute a denial of due process. Id.; see also United States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993); United States v. Zaragoza-Moreira, 780 F.3d 971, 977 (9th Cir. 2015).

Bad faith "requires more than mere negligence or recklessness." United States v. Flyer, 633 F.3d 911, 916 (9th Cir. 2011); see also Cunningham v. City of Wenatchee, 345 F.3d 802, 812 (9th Cir. 2003) ("[W]hile [the officer's] work may have been negligent or incomplete, it was not conducted in bad faith."). "[T]he presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed,

because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith." United States v. Robertson, 895 F.3d 1206, 1211 (9th Cir. 2018) (internal citations omitted). Two indicia of bad faith on the part of the police are "official animus" and a "conscious effort to suppress exculpatory evidence." Trombetta, 467 U.S. at 488; see also Miller v. Vasquez, 868 F.2d 1116, 1121 (9th Cir. 1989).

**B. Motion to Dismiss the Indictment due to Outrageous or Fundamentally Unfair Government Conduct**

When law enforcement officers' actions are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," courts must dismiss the indictment. United States v. Russell, 411 U.S. 423, 431-32 (1973). This remedy is "limited to extreme cases[.]" United States v. Stinson, 647 F.3d 1196, 1209 (9th Cir. 2011). "It is outrageous for government agents to (1) engineer and direct a criminal enterprise from start to finish; (2) to use excessive physical or mental coercion to convince an individual to commit a crime; or (3) to generate new crimes merely for the sake of pressing criminal charges." United States v. Pincombe, Case No. 2:14-cr-00178-JAD-GWF, 2015 WL 8480079, at *5 (D. Nev. Nov. 3, 2015) (citing United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013)); see also United States v. Stenberg, 803 F.2d 422, 429 (9th Cir. 1986). Because "[t]here is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous," each case turns "'on its own particular facts.'" Black, 733 F.3d at 302 (internal citation omitted). To help guide this circumstance-specific inquiry, courts in this circuit consider the six factors set forth in United States v. Black, which include: "(1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue." 733 F.3d at 303.

The first three factors address the government's conduct when initiating a sting, with factors four and five addressing the conduct of the government during the operation. See id. at 304,

308. The final factor concerns the relationship between the type of crime being investigated and whether the techniques used by the government were necessary. See id. at 309. The facts of the case and surrounding circumstances must be considered in their totality. See id. at 304 (noting the factors "do not constitute a formalistic checklist," but rather help courts focus their analysis).

## IV.    DISCUSSION

The Court now turns to the merits of Defendant's Motion to Dismiss.

### A. Motion to Dismiss the Indictment on Due Process Grounds.

First, the Court finds that the video of the call is not materially exculpatory. The evidence sought is not of "such a nature that [Defendant] would be unable to obtain comparable evidence by other reasonably available means." Trombetta, 467 U.S. at 488–89. Defendant retains access to the full audio of the call, as well as the transcript. The government has offered photos of the Decoy from the same day, which would show the jury what Defendant saw during the call. Additionally, the video's exculpatory value was not apparent before the evidence was destroyed. In Zaragoza-Moreira, the defendant "repeatedly alerted" the border patrol agent to the video's "potential usefulness." 780 F.3d at 979. Similarly, in Cooper, "[t]he equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents." 983 F.2d at 931. Here, Officer Johnson was not repeatedly informed of the video's potential value before failing to record it. The transcript of the call reflects that Officer Johnson made the decision that the decoy should accept the call as a video, instead of a phone call, in a split second during the course of the investigation. He testified that, because the video call took place over Snapchat, recording it would have sent an alert to Defendant. In response, Defendant argues that Officer Johnson should have tried to record the call using another device. However, finding that Officer Johnson should have attempted that, when doing so may have compromised the investigation, imposes the exact form of absolute duty that the Ninth Circuit found inappropriate in Miller.

Moreover, the Court does not find that Officer Johnson's actions rise to the level of bad faith. See Youngblood, 488 U.S. at 58 ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."); see also United States v. Martinez-Martinez, 369 F.3d 1076 (9th Cir. 2004)

("The failure to collect and preserve evidence that is potentially exculpatory may violate a defendant's due process rights if that failure was motivated by bad faith."); Miller, 868 F.2d 1120 ("[A] bad faith failure to collect potentially exculpatory evidence would violate the due process clause."). This case is clearly differentiated from Plaintiffs' cited cases, including Miller, Cooper and Zaragoza-Moreira, where the Ninth Circuit held that the government's failure to preserve evidence rose to the level of a due process violation. In Miller, the officer lied about his knowledge of potential exculpatory evidence, sought to dissuade witnesses from testifying, and referred to the petitioner by a slur. Miller, 868 F.2d at 1121. In Cooper, the officer informed counsel that the evidence was stored when, in fact, it had been destroyed and proffered no explanation for having destroyed the materials. 983 F.2d at 931. In Zaragoza-Moreira, law enforcement omitted information regarding the destroyed evidence from three reports after having been informed that the information was crucial to Defendant's case. 780 F.3d at 980. Unlike these cases, Officer Johnson was not previously alerted to the value of the evidence, did not lie or attempt to hide the evidence, provided a credible explanation for failing to record the video, and did not exhibit any malice or prejudice towards the Defendant. While the Court finds that Officer Johnson should have known of the potential relevance of the appearance of the decoy on the video and likely preserved it, this is insufficient by itself to rise to the level of a due process violence. This is because, as the Ninth Circuit has explained, the "failure to collect potentially useful evidence is distinctly different than a destruction of evidence that is already extant." Martinez–Martinez, 369 F.3d at 1087. Officer Johnson did not destroy a video that had already been recorded, but simply failed to create a video in the first place. Finally, there is no evidence of any "official animus" or a "conscious effort to suppress exculpatory evidence," as the government both recorded the audio of the call and subpoena Snapchat to try and gather further evidence.

Therefore, the Court declines to dismiss the indictment against Defendant in the absence of bad faith on Agent Johnson's part. The Defendant remains free, however, to explore this issue with Agent Johnson at trial. The jury ultimately will decide whether the failure to collect evidence by Agent Johnson gave rise to reasonable doubt. The Court will defer to the wisdom of the jury rather than dismiss the indictment without a demonstration of bad faith by Agent Johnson.

**B. Motion to Dismiss the Indictment Based on Outrageous Government Conduct**

Defendant also argues that Agent Johnson committed outrageous government conduct during the reverse sting operation in violation of Mr. Castro's due process rights. He relies heavily on United States v. Lofstead, 574 F. Supp. 3d 831 (D. Nev. 2021), where the United States District Court for the District of Nevada found outrageous government conduct arising out of a reverse sting operation involving sex offenses against a child. The Court applies the Black factors to assess whether the government's conduct amounts to a due process violation.

Courts often consider the first two Black factors together, as they are "closely related." United States v. Snagglers, Case No. 2:14-cr-00086-JCM-PAL, 2015 WL 10436117, at *6 (D. Nev. Dec. 30, 2015). The first Black factor—the "known criminal characteristics of the defendants"—is a close call. 733 F.3d at 303. That factor considers facts such as "whether a defendant had a criminal background or propensity the government knew about when it initiated its sting operation." Id. at 304. Arguably, this factor favors Defendant since the record does not indicate that the government knew about a particular criminal background or propensity involving Mr. Castro when it first deployed the decoy. On the other hand, the State claims that the website Mr. Castro used was known for this kind of activity. In Lofstead, the Task Force posted an advertisement seeking to purchase commercial sex in the Northern Nevada area and had no reason to suspect that Lofstead, or any individual for that matter, was interested in engaging in commercial sex with a child. Here, however, the State was targeting a group for "Vegas Teens" and did have reason to suspect the adult members of that group would be interested in engaging in sex with a minor.

The second Black factor—whether the government had individualized suspicion or a "reason to suspect" Mr. Castro in particular—initially seems to favor Mr. Castro, as no such evidence exists here. Id. Individualized suspicion of a defendant's wrongdoing, however, is not an absolute requirement for a legitimate undercover investigation. Id. In that regard, even when the government does not suspect a particular individual, the government may focus "on a category of persons it had reason to believe were involved in the type of illegal conduct being investigated." Id.; see also United States v. Halgat, Case No. 2:16-cr-00265-GMN-CWH, 2018 WL 8807134, at

*10 (D. Nev. Dec. 26, 2018) (recognizing it was acceptable for law enforcement to launch an undercover investigation of a motorcycle organization to determine if it was engaged in criminal conduct which resulted in arrests over a year later). Once again, there was evidence here that the agents chose the website because it had been used for soliciting sex from minors.

The third factor considers "the government's role in creating the crime," which cuts both ways here. Id. at 303. The agents created the decoy profile. But Defendant was the one who reached out to the decoy on his own initiative, followed-up, and then continued the conversation. In Lofstead, the charged offense differed in kind and orders of magnitude from that which Lofstead was apparently attempting to commit initially. He was attempting to solicit commercial sex. It was the law enforcement officer's decision to change the age of "Emma" from 19 to 16, materially altering the type of crime to attempting to purchase sex from a child. Here, Defendant was always on a site directed to Vegas Teens and he knew the decoy's age from the beginning of the operation. In Lofstead, the court noted that nothing about Lofstead's actions indicated he was actively seeking commercial sex with someone under 18. Here, Defendant was on a site for Vegas Teens, immediately found out that the decoy was underage and continued contact, and repeatedly asked her about activities related to being a minor, such as getting a driver's license and prom and high school. Therefore, the State was not responsible for creating the crime in this case as they took no affirmative steps to alter the nature of the crime, such as actively changing the age of the decoy.

None of the facts relevant to the fourth factor—the government's encouragement of Mr. Castro—rise to the level of "pressure or coercion" indicative of outrageous government conduct. Black, 733 F.3d at 308. The texts between the decoy and Castro lack any indication of "inappropriate activity, threats or coercion to encourage [Castro] to engage in" sexual acts with a minor. Id. In Lofstead, law enforcement agents engaged in significant encouragement and coaxing over a roughly three-hour period after the defendant expressed concerns about the decoy's real age and the legality of the transaction. 574 F. Supp. 3d at 854-55. He repeatedly asked for confirmation of her age, including asking for a photo of "Emma"'s ID. Here, though Castro expressed some hesitation, he only sought reassurance that the decoy was "real"—not reassurance that the "decoy" was not a minor. He expressed no reservations after hearing "her" age and sought no confirmation

that "she" was actually older. His further hesitations were related to expressing specific sexual requests in writing, not in continuing the conversation after learning of the decoy's minority age. He continued to push for further photos and video calls, even when it was the decoy hesitating. The court in Lofstead noted that the defendant's liability arose out of an apparent mistake about the legal age for engaging in commercial sex transactions. There was no such mistake here.

The final factor, considering the seriousness of the crime underlying the actions taken in the reverse sting operation, definitively favors the State. It is undisputed that the offense at issue in this case is a serious, underreported, and difficult to detect offense.

Therefore, the facts do not support Defendant's outrageous-government-conduct defense. This case does not showcase conduct "so outrageous" or "grossly shocking" as to warrant dismissal. Russell, 411 U.S. at 431-32; Stinson, 647 F.3d at 1209 (internal quotation marks omitted).

## V.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that the [33] Motion to Dismiss Indictment Due to Failure to Preserve Evidence, or Due to Outrageous or Fundamentally Unfair Government Conduct filed by Tanner Lucas Castro is **DENIED.**

**DATED:** August 4, 2026.

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

- 12 -